UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BASHAR ZAYADEEN, | ) | |
| | ) | |
| Plaintiff, | ) | 10 C 4621 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| ABBOTT MOLECULAR, INC., and NICK | ) | |
| SEMEDALAS, | ) | |
| | ) | |
| Defendants. | ) | |

## Memorandum Opinion and Order

Bashar Zayadeen brought this suit against his former employer, Abbott Molecular, Inc.

("AMD"), and his former supervisor, Nick Semedalas, alleging that he was subjected to a hostile

work environment, discriminated against on account of his race and national origin, and

retaliated against for complaining about the harassment, all in violation of 42 U.S.C. § 1981,

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the Illinois Human

Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq*.  Doc. 22.  Defendants have moved for summary

judgment.  Doc. 41.  The motion is granted in part and denied in part.

### Background

The facts must be stated as favorably to Zayadeen, the non-movant, as permitted by the

record and Local Rule 56.1.  By reciting these facts, the court does not intend to endorse them or

to vouch for their truth.

### A.    The Parties

In 2004, Zayadeen began working for Abbot Labs as a Financial Analyst.  Doc. 48 at ¶ 9;

Doc. 43-5 at 12, 64-65.  In July 2007, Zayadeen became a Senior Financial Analyst at the Des

-1-

Plaines, Illinois, headquarters of AMD, where he remained employed until July 2010.  Doc. 48 at ¶¶ 9-10.  AMD is a global company in the healthcare industry.  *Id*. at ¶ 1.

### B.     The Harassment

Zayadeen was born in Amman, Jordan, and is Arab.  Doc. 48 at ¶ 58; Doc. 57 at ¶ 1.  Zayadeen claims that he was harassed at AMD by fellow employees Peter Karabatsos, Marc Heller, and Nick Semedalas on account of his race and national origin.  Doc. 48 at ¶ 63; Doc. 43-5 at 25.  Semedalas and Karabatsos gave Zayadeen the nickname "Borat," in reference to the title character in the movie, *Borat: Cultural Learnings of America for Make Benefit of Glorious Nation of Kazakhstan*.  Doc. 48 at ¶ 60; Doc. 57 at ¶¶ 7a, 9.  *Borat* is a comedy about a fictional Kazakh journalist, Borat, who visits the United States to make a documentary about American culture.  Borat has unruly hair, a bushy mustache, a thick accent, and profoundly chauvinistic and anti-Semitic views.  Doc. 57 at ¶ 8; Doc. 43-6 at 18.  Much of the film's humor stems from the culture shock that Borat experiences in the United States, and from the shock that Borat causes those he encounters in this country.

Karabatsos and Semedalas routinely called Zayadeen "Borat" and encouraged other employees to do so as well, including employees senior to Zayadeen.  Karabatsos and Semedalas told other employees that Zayadeen was from Kazakhstan, poked fun at the similarity of Zayadeen's and Borat's accent and appearance, and told Zayadeen that Americans "don't do or think the way your people in Kazakhstan [do]."  Doc. 48 at ¶ 60; Doc. 57 at ¶¶ 7b-e, 9, 11, 20-21, 24; Doc. 43-5 at 20.  These comments occurred in an open cubical area and were overheard by other employees, including those senior to Zayadeen and at least one employee in the Human Resources Department.  Doc. 57 at ¶ 19-24.  Other isolated incidents of harassment included:

-2-

- Before Zayadeen took a vacation to Jordan in October 2007, Heller told him: "Well, I don't want to be sitting home watching the news and I see you stuck to the front of an Israeli tank." Doc. 48 at ¶ 61; Doc. 57 at ¶ 13.

- In early 2008, after hearing Zayadeen speak Arabic, Heller told him: "We let you in this country, and we gave you a Green Card. The least you can do is speak English." Doc. 48 at ¶ 61; Doc. 57 at ¶ 12.

- In 2008, Semedalas told Zayadeen that Arabic is a "dirty language" that causes the problems in the Middle East, and that Jordanian food looks like "dog food." Doc. 48 at ¶ 62; Doc. 57 at ¶ 7f-g; Doc. 43-5 at 26.

Zayadeen was the only Jordanian or Arab in his immediate department, and he did not observe other minorities receive similar treatment. Doc. 57 at ¶¶ 16-18; Doc. 49-9 at ¶¶ 5-10. (Zayadeen's department head, Robert Michael, was Assyrian, and AMD eventually hired Joseph Abraham, also Assyrian, Doc. 48 at ¶¶ 11, 42; Doc. 43-3 at ¶¶ 9-10; Doc. 43-5 at 256, 273, but "Assyrians are non-Arab people." *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000); *see also Sevoian v. Ashcroft,* 290 F.3d 166, 177 (3d Cir. 2002) (same).)

Zayadeen never complained about the harassment directly to his superiors or to the Human Resources Department, Doc. 48 at ¶¶ 65, 81; Doc. 43-6 at 6, but he did repeatedly ask Semedalas and Karabatsos to stop calling him Borat because he found it offensive, Doc. 57 at ¶ 25. Zayadeen's supervisor, Ron Johnson, overheard Zayadeen complain about the harassment but took no steps to prevent it. Doc. 48 at ¶ 65; Doc. 57 at ¶ 14; Doc. 43-5 at 23, 29, 60. Another AMD employee, Paul Clark, also overheard the name-calling and believed that it upset Zayadeen. Doc. 48 at ¶ 80; Doc. 57 at ¶ 23; Doc. 43-6 at 6.

By the end of 2008, the Borat harassment had ceased. Doc. 48 at ¶¶ 59, 64; Doc. 43-5 at 21-22; Doc. 22 at ¶¶ 18-19, 21, 24, 26, 29. However, from November 2008 through March 2009, Semedalas continued to harass Zayadeen by blaming him for problems at work that were not

Zayadeen's fault. Doc. 48 at ¶¶ 59, 64; Doc. 57 at ¶ 15. Zayadeen recalls two specific instances

of such harassment: in early 2009, Semedalas came to Zayadeen's cubical and yelled at him for

supposedly failing to make a budget, and in February or March 2009, Semedalas yelled at

Zayadeen for double counting assets on the books of AMD and Ibis, a company that Abbott had

recently acquired. Doc. 57 at ¶ 15; Doc. 43-5 at 27-29, 60.

### C. Zayadeen's Performance

In 2008, Johnson gave Zayadeen a lukewarm performance review. Johnson noted that

Zayadeen did not always complete his work on time, that he failed to maintain an adequate

version control system, that he could not complete his work without significant help from

Johnson, that he had trouble communicating critical information to his audience, and that his

balance sheet analysis did not always reconcile with the ledger. Doc. 48 at ¶¶ 15-16, 22; Doc.

43-5 at 108-09. Johnson initially planned on giving Zayadeen an overall "Partially Achieved

Expectations" rating. Doc. 48 at ¶ 17. That rating would have been the second lowest of the four

possible ratings: Exceeds Expectations, Achieved Expectations, Partially Achieved Expectations,

and Not Achieved Expectations, Doc. 48 at ¶ 18, and likely would have prevented Zayadeen

from applying to different positions at Abbott. Doc. 48 at ¶ 21. Not wanting to restrict

Zayadeen's career, Johnson gave Zayadeen's overall rating to "Achieved Expectations." Doc. 48

at ¶¶ 19-20; Doc. 49-12 at 2. As a result of this rating, Zayadeen received a 3% merit increase in

pay. Doc. 57 at ¶ 26.

In January 2009, Heller became Zayadeen's supervisor. Doc. 48 at ¶ 13. Like Johnson,

Heller found Zayadeen's performance to be subpar. Doc. 48 at ¶ 23. Heller discovered that

Zayadeen double-counted expenditures, that he was struggling to reconcile the Developmental

and Clinical Inventory ("Dev/Clin") account, and that he had difficulty explaining to company personnel why the present accounting data varied from prior forecasts. Doc. 48 at ¶¶ 26-28. Zayadeen claims that his troubles with the Dev/Clin account were actually caused by another individual's poor work. Doc. 48 at ¶ 27; Doc. 49-9 at ¶ 13.

In June 2009, Heller wrote a Summary of Performance Expectations ("SPE") letter to Zayadeen "to provide a foundation to assist [Zayadeen] in improving his performance." Doc. 48 at ¶¶ 29-30, 33; Doc. 43-5 at 213-19. An SPE is a formal step used by Abbott to manage its employees' performance problems. Doc. 48 at ¶ 31. If an employee fails to address adequately the issues raised in an SPE, the employee may be issued a Performance Improvement Plan ("PIP"), which is the final step in Abbott's performance management process. Doc. 48 at ¶ 32. Heller reviewed the SPE with Semedalas to make him aware of Zayadeen's performance issues because on June 1, 2009, Semedalas was to become Zayadeen's supervisor. Doc. 48 at ¶¶ 14, 34; Doc. 57 at ¶ 29. Despite these documented performance issues, two senior directors for whom Zayadeen provided accounting services told Zayadeen in June 2009 that he had been doing a good job. Doc. 57 at ¶ 28; Doc. 43-5 at 32; Doc. 49-19 at 3.

### D.      Zayadeen's Separation from AMD

In June 2009, shortly after receiving the SPE letter, Zayadeen requested a personal leave of absence ("PLOA") to attend his brother's wedding in Jordan and to address some issues with his parents' estate. Doc. 48 at ¶ 37; Doc. 57 at ¶ 30; Doc. 43-5 at 69. On July 2, Semedalas approved Zayadeen's request for leave from July 13, 2009 through November 15, 2009. Doc. 48 at ¶ 41; Doc. 57 at ¶ 31; Doc. 43-5 at 77. Semedalas noted on the PLOA request that Zayadeen was an employee in good standing. Doc. 57 at ¶ 27.

Semedalas testified that because Zayadeen was the only individual from the finance group providing support for the R&D Department and because he did not have time to cover for Zayadeen, he decided to immediately fill Zayadeen's position. *Id*. at ¶ 36. Semedalas says that Zayadeen's past performance played no role in his decision to post the position. *Id*. at ¶ 38. Semedalas began the process of posting the position before Zayadeen went on leave, and eventually posted it as a "permanent position." *Id*. at ¶¶ 34-35. Semedalas did not hire a replacement until November 13, 2009, and the replacement did not begin work until December 28, 2009. *Id*. at ¶ 40.

Before taking leave, Zayadeen was given a copy of AMD's PLOA policy, which stated that his job was not guaranteed to be available when he returned; whether the job remained available would be up to Semedalas. Doc. 48 at ¶¶ 38-39; Doc. 43-2 at ¶ 8, p. 52; Doc. 43-5 at 58, 71. (Zayadeen also was given an obsolete version of the PLOA policy, which did not include the proviso about there being no such guarantee, but it is undisputed that Zayadeen was given the then-current version, which did inform him that there was no guarantee.) Zayadeen claims that Semedalas never provided any indication that his job would not be available when he returned. Doc. 57 at ¶ 33; Doc. 43-5 at 58. Semedalas testified that he told Zayadeen he needed to fill the position because the Finance Department's busiest period—preparing the year's budget forecast—was about to begin. Doc. 48 at ¶ 50; Doc. 57 at ¶ 33; Doc. 43-5 at 253. But Semedalas did not indicate on Zayadeen's PLOA request that there were business needs that would warrant denying the PLOA. Doc. 57 at ¶ 37.

After Zayadeen began his leave, Semedalas discovered several problems with Zayadeen's work—Zayadeen had failed to update accounting data, had misclassified expenses, had failed to

maintain a version control system, and had failed to resolve the inconsistencies with the Dev/Clin account.  Doc. 48 at ¶¶ 36, 51-56; Doc. 43-5 at 277-78; Doc. 49-9 at ¶ 14.  Due to these problems, the Finance Department could not provide senior management with documentation to support the budget forecast and individual department managers had difficulty tracking their budgets.  Doc. 48 at ¶¶ 53, 56.  Semedalas highlighted one particularly costly error—Zayadeen had misclassified an asset sale to Ibis as a consulting charge rather than separating out the equipment component charge, costing Abbott a $217,905 write-off.  Doc. 48 ¶¶ 24-25; Doc. 43-5 at 269-70, 277-78.  Zayadeen responds that Semedalas also did not know how to classify the Ibis sale, that Zayadeen had received approval for the classification from the Controller of U.S. Sales, and that the real value of the write-off was around $68,000.  Doc. 49-9 at ¶¶ 11-12.  Zayadeen also says that he had made the appropriate adjustments to the Dev/Clin account prior to leaving. *Id.* at ¶ 14.

On August 24, 2009, when Zayadeen attempted to return early from his PLOA, Semedalas told him that his position was no longer available.  Doc. 57 at ¶ 39.  Semedalas testified that this decision was driven by the problems that he had discovered after Zayadeen went on leave.  Doc. 48 at ¶ 57; Doc. 57 at ¶ 38.  Zayadeen then extended his leave through July 12, 2010, for a total of one year, the maximum allowed.  Doc. 48 at ¶ 43; Doc. 43-5 at 79-80. Zayadeen was officially separated from AMD when his PLOA expired.  Doc. 48 at ¶ 49.

While on leave, Zayadeen unsuccessfully applied for thirty different positions at Abbot. Doc. 48 at ¶ 44.  Nine different account managers and twenty-seven different hiring managers were responsible for these positions, none of whom knew Zayadeen's race or national origin or were aware that Zayadeen had made any complaints of discrimination.  Doc. 48 at ¶¶ 45-48.

Between 2008 and 2010, nine other employees at AMD's Des Plaines office took a PLOA; like Zayadeen, none were reinstated. Doc. 48 at ¶ 40; Doc. 43-6 at 28. Zayadeen believes one other employee was reinstated after a leave of absence, but he admits that he did not know whether that employee took a PLOA or some other type of leave of absence. Doc. 48 at ¶ 40; Doc. 43-5 at 17.

### E. Zayadeen's Administrative Charge and AMD's Investigation

On November 12, 2009, Zayadeen filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR"). Doc. 48 at ¶ 67; Doc. 22-1. In his charge, Zayadeen checked the boxes for "retaliation" and "national origin" discrimination, but did not check the box for "race" discrimination. Doc. 22-1 at 1. The narrative portion of the charge references only retaliation and national origin discrimination, and does not mention race discrimination. *Id*. at 1-5.

Upon receiving notice of the charge, AMD investigated Zayadeen's allegations. Doc. 48 at ¶¶ 68-69. Karabatsos and Semedalas admitted that they had referred to Zayadeen as "Borat," and Heller admitted that he had overheard others referring to Zayadeen as "Borat." Doc. 48 at ¶¶ 70-72. However, AMD determined that its Workplace Harassment policy had not been violated because the Borat comments were nothing more than workplace banter that Zayadeen had not previously reported, and also because the comments were not connected to Zayadeen's national origin or any other protected class. Doc. 48 at ¶¶ 73, 78-79. AMD further found that Semedalas's decision not to reinstate Zayadeen was due to Zayadeen's poor work performance, not his national origin. Doc. 48 at ¶ 82; Doc. 43-5 at 157-60. That said, AMD required Karabatsos, Semedalas, Heller, and Johnson to attend Workplace Harassment training, finding

that they each had either made inappropriate comments or had failed to be aware of, stop, and/or report the inappropriate comments of others. Doc. 48 at ¶¶ 74-77, 83; Doc. 43-5 at 162-65.

On May 7, 2010, the EEOC issued a right to sue letter. Doc. 22-2. On July 26, 2010, Zayadeen timely filed this suit. Doc. 1.

## Discussion

The amended complaint sets forth three claims: (1) Zayadeen was subjected to a hostile work environment based on his race and national origin; (2) his employment was terminated due to his national origin and race; and (3) his employment was terminated in retaliation for his complaining internally about the harassment. Doc. 22. The claims against AMD are brought under Title VII, § 1981, and the IHRA, while the claims against Semedalas are brought only under § 1981. *Id*. at ¶¶ 15, 45, 49. This is appropriate, as § 1981 provides for individual liability while Title VII and the IHRA do not. *See Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 783 (7th Cir. 2006); *Williams v. Banning*, 72 F.3d 552, 553-54 (7th Cir. 1995); *Zaderaka v. Ill. Human Rights Comm'n*, 545 N.E.2d 684, 687-88 (Ill. 1989); *Sommerfield v. City of Chicago*, 2011 WL 4553021, at *6 (N.D. Ill. Sept. 29, 2011); *Washington v. Univ. of Ill. at Chi.*, 2010 WL 1417000, at *3 (N.D. Ill. Apr. 2, 2010) (citing *In re Kuna-Jacob & Roesch*, 2009 WL 2382456, at *5 (Ill. Human Rights Comm'n Mar. 17, 2009)). Except where noted, the substantive and procedural frameworks governing the Title VII, the IHRA, and § 1981 claims are the same. *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011); *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010); *Bennett v. Roberts*, 295 F.3d 687, 697 (7th Cir. 2002); *Zaderaka*, 545 N.E.2d at 687-88; *Kalush v. Ill. Dep't of Human Rights Chief Legal Counsel*, 700 N.E.2d 132, 141 (Ill. App. 1998).

## I.      Hostile Work Environment Claim

Defendants contend that Zayadeen's hostile work environment claim is time-barred, was not properly exhausted, and fails on the merits.  Defendants are correct that the IHRA hostile work environment claim is time-barred, but their arguments otherwise fail.  The Title VII and § 1981 hostile work environment claims will proceed to trial.

### A.      Statute of Limitations

Because the statute of limitations for Title VII claims in Illinois is 300 days, 42 U.S.C. § 2000e-5(e)(1); *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 684 n.5 (7th Cir. 2010), Zayadeen had to file his administrative charge "within 300 days of the last hostile act" contributing to the hostile work environment, *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011).  *See also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) ("[p]rovided that an act contributing to the [hostile work environment] claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court").  Defendants argue that the last possible hostile act occurred in late 2008, when Zayadeen's co-workers were still calling him Borat.  Zayadeen argues that the last hostile act occurred no earlier than March 2009, when Semedalas yelled at him about work problems that were not his fault.  If Defendants are correct, Zayadeen's Title VII hostile work environment claim is time-barred because he did not file his charge until November 12, 2009, which is 316 days after December 31, 2008.

"A court's task is to determine whether the acts about which an employee complains are part of the *same* actionable hostile work environment practice, and if so, whether any act falls within the statutory time period."  *Morgan*, 536 U.S. at 120 (emphasis added).  "[H]ostile work environment claims involve[] 'repeated conduct' that 'may not be actionable on its own.'  Rather

'such claims are based on the cumulative effect of individual acts.'" *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 724 (7th Cir. 2004) (quoting *Morgan*, 536 U.S. at 515) (internal alternations omitted). "The concept of cumulation suggests a critical limiting principle. Acts so discrete in time or circumstances that they do not reinforce each other cannot reasonably be linked together into a single chain, a single course of conduct, to defeat the statute of limitations." *Id*. at 727 (internal quotation marks and alternations omitted). Three factors are relevant to determining whether different instances of harassment are part of the same hostile work environment claim: "1) whether the acts involve the same subject matter; 2) the frequency with which the acts occur; and 3) the degree of permanence of the alleged acts of discrimination that should trigger an employee's awareness and duty to assert his rights." *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 708 (7th Cir. 2002); *see also Willis v. City of Chicago*, 2005 WL 1838342, at *4-5 (N.D. Ill. Aug. 1, 2005).

It cannot be said as a matter of law that the 2009 instances of alleged harassment, when Semedalas allegedly yelled at Zayadeen for no reason, were not part of the same course of harassing conduct as the Borat name-calling. Semedalas did both the yelling and the name-calling, suggesting that they were both part of the same course of harassment. *Cf. EEOC v. Caterpillar Inc.*, 503 F. Supp. 2d 995, 1032-33 (N.D. Ill. 2007) (finding that harassing acts were not related, in part because they were committed by different individuals). Moreover, there was very little, if any, gap in time between the yelling and the name calling; the yelling began in November 2008, about the time the name-calling ceased. *Compare Miller v. Ill. Dep't of Corr.*, 2011 WL 1120270, at *5 (N.D. Ill. Mar. 24, 2011) (a gap of between one and two years did not break the link between two sets of harassing conduct), *with Lucas*, 367 F.3d at 727 (noting that

-11-

gaps of two, three, and eight years have been held to break the link). The greatest distinction

between the yelling and the name-calling concerns the manner of harassment. But the Seventh

Circuit has cautioned that "[i]t is inappropriate to draw lines … by the particular method" used to

harass. *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 769-70 (7th Cir. 2007).

Because Zayadeen filed his EEOC charge within 300 days of March 2009, his Title VII

claim is timely. The same is not true for his IHRA hostile work environment claim. The statute

of limitations for filing an IHRA charge is 180 days, not 300 days. *See* 775 ILCS 5/7A-

102(A)(1); *Sangamon Cnty. Sheriff's Dep't v. Ill. Human Rights Comm'n*, 908 N.E.2d 39, 47-48

(Ill. 2009); *Jones v. Lockard*, 956 N.E.2d 623, 629-31 (Ill. App. 2011). Assuming that

Semedalas yelled at Zayadeen on the last possible day supported by the record (March 31, 2009),

Zayadeen had to file his state charge by September 27, 2009. He did not do so, making the IHRA

hostile work environment claim untimely.

Defendants do not argue that the § 1981 hostile work environment claim is untimely. Nor

could they, as § 1981 has a four-year limitations period. *See Jones v. R.R. Donnelley & Sons Co.*,

541 U.S. 369, 382-83 (2004) (holding that the four-year statute of limitations in 28 U.S.C.

§ 1658(a) applies to hostile work environment claims brought under § 1981); *Dandy v. United

Parcel Serv., Inc.*, 388 F.3d 263, 269 (7th Cir. 2004).

**B.      Exhaustion**

The § 1981 claim is not subject to an exhaustion requirement, though the Title VII claim

is. *See Walker v. Abbott Labs.*, 340 F.3d 471, 474 (7th Cir. 2003). A plaintiff cannot bring a

Title VII claim not previously alleged in an EEOC administrative charge unless "the claim is like

or reasonably related to the EEOC charges, and the claim in the complaint reasonably could be

expected to grow out of an EEOC investigation of the charge." *Miller v. Am. Airlines, Inc.*, 525 F.3d 520, 525 (7th Cir. 2008) (internal quotation marks omitted). Defendants argue that Zayadeen's claim of *racial* harassment, based on his being an Arab, is beyond the scope of his EEOC charge because the charge alleges only *national origin* harassment based on his being Jordanian. (Defendants do not argue that Arab is not a race for purposes of Title VII.)

"[C]ourts have … recognized that race and national origin discrimination claims may substantially overlap or even be indistinguishable depending on the specific facts of a case." *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003); *see also Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring) ("Often [race and national origin] are identical as a factual matter: one was born in the nation whose primary stock is one's own ethnic group."); *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006); *Sinai v. New England Tel. & Tel. Co.*, 3 F.3d 471, 475 (1st Cir. 1993); *Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1472 (7th Cir. 1993); *Bullard v. OMI Ga., Inc.*, 640 F.2d 632, 634 (5th Cir. Unit B 1981). Zayadeen's race and national origin claims are "reasonably related," as they are based on the same factual predicate. *Compare* Doc. 22 (complaint) *with* Doc. 22-1 (EEOC charge). Jordan is 98 percent Arab, *see* CIA, *Middle East: Jordan*, The World Factbook, https://www.cia.gov/library/publications/the-world-factbook/geos/jo.html (last visited Jan. 29, 2013), and Zayadeen's charge specifically references an incident in which he was harassed for speaking Arabic. Doc. 22-1 at 2. For these case-specific reasons, Zayadeen's race and national origin claims are sufficiently related to save the race claim from being barred by the exhaustion doctrine. *See Deravin*, 335 F.3d at 202-03; *Oranika v. City of Chicago*, 2005 WL 2663562, at *4

(N.D. Ill. Oct. 17, 2005) ("an allegation of discrimination on the basis of being Nigerian strongly implies discrimination on the basis of color and race").

### C.      Merits

A court "[should] not find a hostile work environment for mere offensive conduct that is isolated, does not interfere with the plaintiff's work performance, and is not physically threatening or humiliating." *Ibid*. To survive summary judgment, Zayadeen must present evidence sufficient for a reasonable jury to find that: "(1) that h[is] work environment was both objectively and subjectively offensive; (2) that the harassment was based on h[is] race [or national origin]; (3) that the conduct was either severe or pervasive; and (4) that there is a basis for employer liability." *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011). Defendants contend that Zayadeen has not satisfied the last three requirements.

### 1.      Whether the Harassment Was Motivated by Race or National Origin

National origin discrimination under Title VII is defined broadly "to include the denial of employment opportunities because of an individual's, or his or her ancestor's, place of origin or *because an individual has the physical, cultural, or linguistic characteristics of a national origin group*." *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 923 (7th Cir. 2007) (citing 29 C.F.R. § 1606.1); *see Al Herwi v. Jones Lang LaSalle*, 2011 WL 3664443, at *2 (N.D. Ill. Aug. 19, 2011); *McIntosh v. Ill. Dep't of Employment Sec.*, 2007 WL 1958577, at *5 (N.D. Ill. July 2, 2007). The alleged harassment in this case comfortably fits within that definition. Zayadeen's co-workers made fun of his physical appearance ("you look like Borat"), his accent ("you talk like Borat"), his native language (Arabic is a "dirty language"), and his food ("that looks like dog

food"). Given this, a reasonable jury could conclude that Zayadeen was harassed based on his Jordanian national origin.

Defendants insist that the Borat harassment could not have been motivated by Zayadeen's national origin because Zayadeen is from Jordan, while Borat is from Kazakhstan. This argument fails for two reasons. First, it fails to acknowledge that some of the harassment had nothing to do with Borat and concerned only Zayadeen's speaking the Arabic language and eating Jordanian food. Second, the argument incorrectly assumes that an individual can suffer national origin harassment only if the harassment regards his *actual* country of origin. The EEOC Guidelines, an appropriate source of guidance, *see Karraker v. Rent-A-Center, Inc.*, 411 F.3d 831, 835 n.2 (7th Cir. 2005), state that "[i]n order to have a claim of national origin discrimination under Title VII, it is not necessary to show that the alleged discriminator knew the *particular* national origin group to which the complainant belonged. … [I]t is enough to show that the complainant was treated differently because of his or her foreign accent, appearance or physical characteristics." Guidelines on Discrimination Because of National Origin, 45 Fed. Reg. 85,632, 85,633 (Dec. 29, 1980). Thus, it makes no difference whether Zayadeen's harassers did not understand or intentionally fuzzed the distinction between Jordan and Kazakhstan when engaging in the harassment. *See EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 401-02 (5th Cir. 2007) (holding that harassment consisting of calling the plaintiff "Taliban" or "Arab" was motivated by plaintiff's national origin, even though the plaintiff was Indian); *Langadinos v. Appalachian Sch. of Law*, 2005 WL 2333460, at *1 n.6 (W.D. Va. Sept. 25, 2006) ("Plaintiffs do not lose the protection of discrimination laws because they are discriminated against for the wrong reasons."); *LaRocca v. Precision Motorcars, Inc.*, 45 F. Supp. 2d 762, 770 (D. Neb.

1999) ("The fact that Ms. Friend ignorantly used the wrong derogatory ethnic remark toward the plaintiff is inconsequential.").

Turning to the Title VII racial harassment claim, a reasonable jury could conclude that Zayadeen was harassed because he is Arab. Two of the incidents of harassment were prompted by Zayadeen speaking Arabic: Heller chastised him for speaking Arabic, and Semedalas told him that Arabic was a "dirty language" that causes problems in the Middle East. An individual's language may be a defining characteristic of his ancestry and therefore of his race. *See Hernandez v. New York*, 500 U.S. 352, 371 (1991) (plurality) ("It may well be, for certain ethnic groups and in some communities, that proficiency in a particular language, like skin color, should be treated as a surrogate for race under an equal protection analysis."); *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 173 (3d Cir. 1991) (relying on the fact that the plaintiff spoke Spanish at home as evidence that he was Hispanic, and noting that "[c]ensus information often relies on the primary language spoken in the home as a means of classifying persons by race"). This is true for Arabs and the Arabic language. *See* William D. Wunderle, *Through the Lens of Cultural Awareness: A Primer for US Armed Forces Deploying to Arab and Middle Eastern Countries* 25 (Combat Studies Institute Press 2007) (noting that in 1946, the Arab League defined "Arab" to be "a person whose language is Arabic, who lives in an Arabic speaking country, [and] who is in sympathy with the aspirations of the Arabic speaking peoples.").

Defendants' contention that the Borat harassment could not have been due to Zayadeen being Arab because Borat was not Arab is unconvincing. The contention does not account for the other harassment of Zayadeen, and it also relies on a naive view of the movie *Borat*. Among the movie's comedic elements was that Borat, though a Kazakh, is occasionally mistaken for an

-16-

Arab or told that he looked Arab. In one scene, Borat attends a rodeo and receives the following

advice from the rodeo manager:

| | |
|---|---|
| Rodeo Manager: | Of course every picture that we get back from the terrorists or anything else; the Muslims, they look like you. Black hair and a black moustache. |
| Borat: | Yeah. |
| Rodeo Manager: | So shave that dadgum moustache off, so you're not so conspicuous, so you look like maybe an Italian. Or somethin'. |
| Borat: | Yes. |
| Rodeo Manager: | As far as from people lookin' at ya. I see a lot of people and I think "there's a dadgum Muslim, I wonder what kind of bomb he's got strapped to him." |
| Rodeo Manager: | And you probably aren't a Muslim, maybe that's not your religion, but … |
| Borat: | No, I am a Kazakh … |
| Rodeo Manager: | Yeah, but … |
| Borat: | I follow the hawk. |
| Rodeo Manager: | Yeah, but you look like one of 'em. When this thing gets over with and when we win it, and kick the butts over there … |
| Borat: | Yes. |
| Rodeo Manager: | And all of them son of a butts hangin' from the gallows. |
| Borat: | [Getting excited] Yes! |
| Rodeo Manager: | By that time you will have proven yourself and they'll understand and you will be excepted. Take care. |
| Borat: | Thank you. … |

-17-

http://m.imdb.com/title/tt0443453/quotes?qt=qt0522805 (last visited Jan. 29, 2013). With this context, a jury reasonably could find that Zayadeen's co-workers were playing along with the joke by intentionally conflating Arab and Kazakh identities. If so, the harassment would have been due to Zayadeen's race, for the harassment would make no sense if Zayadeen were not Arab. Or perhaps Zayadeen's co-workers missed the joke and were unaware Arabs and Kazakhs are different. If so, the harassment would still have been because of Zayadeen's Arab race; as with a national origin claim, using the incorrect derogatory racial remarks is not a defense. *See Langadinos*, 2005 WL 2333460, at *1 n.6; *LaRocca*, 45 F. Supp. 2d at 770.

Unlike Title VII, § 1981 "applies to allegations of discrimination based on race but not national origin." *Pourghoraishi*, 449 F.3d at 756. Section 1981's definition of race encompasses Arabs. *Id*. at 756-57 (citing *Saint Francis Coll.*, 481 U.S. at 609, and *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617-18 (1987)). Zayadeen's § 1981 claim therefore may proceed on a theory of race harassment, though not national origin harassment.

Defendants argue that Zayadeen admitted that he has no racial harassment claims when he testified at his deposition that he was harassed only on account of his national origin. Doc. 43-5 at 20. Zayadeen's testimony is not as meaningful as Defendants believe. As the foregoing discussion shows, there often is a very fine line between race and national origin. Race concerns a person's "ancestry and … physical traits," *Abdullahi v. Prada USA Corp.*, 520 F.3d 710, 712 (7th Cir. 2008), and national origin concerns a person's "physical, cultural, or linguistic characteristics," *Salas*, 493 F.3d at 923. Even "[i]n the federal courts, there is uncertainty about what constitutes race versus national origin discrimination under Title VII." *Ibid.*; *see also Pourghoraishi*, 449 F.3d at 756 ("the line between discrimination based on ancestry or ethnic

-18-

characteristics, and discrimination based on place or nation of … origin is not a bright one")
(internal quotation marks omitted) (alterations in original).  So it is impossible to say with any
degree of confidence what Zayadeen meant when he said he had suffered national origin
harassment.  Having been born in a country that is 98 percent Arab, perhaps Zayadeen saw no
difference between racial and national origin harassment.  These terms are too unclear,
particularly to a layperson, to take Zayadeen's testimony as a conclusive admission that he has no
racial harassment claim.

### 2.    Whether the Harassment Was Severe or Pervasive

To survive summary judgment, Zayadeen also "must show that the alleged harassment
was both subjectively and objectively so severe or pervasive that it altered the conditions of his
employment."  *Yancick*, 653 F.3d at 544; *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21
(1993).  This element of Zayadeen's harassment claim "is in the disjunctive—the conduct must
be *either* severe *or* pervasive."  *Vance*, 646 F.3d at 469.  A court addressing this element must
"look to all the circumstances, including the frequency of the discriminatory conduct; its severity;
whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it
unreasonably interferes with an employee's work performance."  *Russell v. Bd. of Trs. of Univ. of
Ill. at Chi.*, 243 F.3d 336, 343 (7th Cir. 2001) (internal quotation marks omitted); *see also Ellis v.
CCA of Tenn. LLC*, 650 F.3d 640, 647 (7th Cir. 2011).  Federal employment law does not impose
a "general civility code" in the workplace, and "simple teasing, offhand comments, and isolated
incidents (unless extremely serious) will not amount to discriminatory changes in the terms and
conditions of employment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal
quotation marks and citation omitted).

-19-

Drawing all inferences in Zayadeen's favor, the record (resolving all genuine factual disputes in Zayadeen's favor) shows that he was ridiculed for looking and speaking like a foreign-born person on a regular basis from July 2007 to the end of 2008, and was yelled at by one of the harassers as late as March 2009. The harassment was not particularly severe—no physical threats were made—but a jury could find it pervasive. The Borat harassment occurred in an open cubical area and was overheard by many employees, including those senior to Zayadeen, and Semedalas encouraged senior employees to refer to Zayadeen as Borat. Moreover, Semedalas told Zayadeen that he spoke a "dirty language" and ate "dog food," and Heller criticized him for speaking Arabic. A jury could reasonably conclude that routinely being so ridiculed, mostly in the presence of his co-workers and superiors, altered the conditions of Zayadeen's employment. *See Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047-48 (7th Cir. 2002) ("a relentless pattern of lesser harassment that extends over a long period of time also violates [Title VII]").

### 3. Whether There Is a Basis for Employer Liability

The law governing the final element of Zayadeen's hostile work environment claim, whether there is a basis for employer liability, is as follows:

> The question whether there is a basis for employer liability depends on whether the alleged harassment was perpetrated by supervisors or coworkers. Employers are "strictly liable" for harassment inflicted by supervisors, but they can assert an affirmative defense when the harassment does not result in a tangible employment action. If only coworkers were culpable for making a work environment hostile, the plaintiff must show that the employer has "been negligent either in discovering or remedying the harassment."

*Vance*, 646 F.3d at 469-70 (internal citations omitted).

The initial question, then, is whether Zayadeen was harassed by a supervisor. "'Supervisor' is a legal term of art for Title VII purposes" and means "someone with the power to *directly* affect the terms and conditions of the plaintiff's employment." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004). The Seventh Circuit "ha[s] not joined other circuits in holding that the authority to direct an employee's daily activities establishes supervisory status under Title VII." *Vance*, 646 F.3d at 470. In 2007 and 2008, when Zayadeen was subjected to the Borat harassment, Johnson, a non-participant in the harassment, was Zayadeen's supervisor. And when Semedalas yelled at Zayadeen in early 2009, Heller was Zayadeen's supervisor. It follows that Zayadeen's harassers were his co-workers, not his supervisors.

Because Zayadeen's harassers were his co-workers at the time of the harassment, AMD can be held liable for the harassment only if he proves that AMD was "negligent either in discovering or remedying the harassment." *Vance*, 646 F.3d at 470 (internal quotation marks omitted). An employer is negligent if it does not "promptly and adequately respond to [the] harassment." *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 383 (7th Cir. 2012) (internal quotation marks omitted) (alterations in original). AMD argues that its response could not have been negligent because Zayadeen never formally complained to a supervisor, the Human Resources Department, or the Employee Relations Department.

The argument is unpersuasive. Much of the harassment occurred in an open cubicle area where others, including employees senior to Zayadeen, could see and hear what was happening. Johnson, Zayadeen's supervisor, had actual knowledge of the harassment and Zayadeen's complaints to Semedalas. This evidence in itself is sufficient to create a jury question as to whether AMD had notice of the alleged harassment and failed to adequately respond. *See*

*Hrobowski v. Worthingon Steel Co.*, 358 F.3d 473, 478 (7th Cir. 2004); *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1046 n.8 (7th Cir. 2000); *Wilson v. Chrysler Corp.*, 172 F.3d 500, 509 (7th Cir. 1999) ("We have previously recognized that notice may be presumed where the work environment is permeated with pervasive harassment. We note that virtually all of the disparate acts of harassment of which Wilson complains took place on the floor of the assembly plant which, by design, is a peculiarly communal employment forum.") (citations omitted); *Sommerfield v. City of Chicago*, 2010 WL 3786968, at *11 (N.D. Ill. Sept. 20, 2010); *Benitez v. Am. Standard Circuits, Inc.*, 678 F. Supp. 2d 745, 759-61 (N.D. Ill. 2010); *EEOC v. Ceisel Masonry, Inc.*, 594 F. Supp. 2d 1018, 1026 (N.D. Ill. 2009) (denying summary judgment where there was evidence that supervisors had actual knowledge of the harassment). The presence of a jury question is confirmed by evidence that AMD took no remedial action until its November 2009 investigation, after Zayadeen's termination and filing of an administrative charge. *See EEOC v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 434-36 (7th Cir. 2012) (holding that management's failure to investigate and report incidents of sexual harassment made the employer's response unreasonable); *Cerros*, 398 F.3d at 954 ("Our cases recognize prompt investigation of the alleged misconduct as a hallmark of reasonable corrective action."); *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1275 (7th Cir. 1991) (affirming a finding of employer liability where "management had knowledge of the harassment directed at Daniels, [but] was less than diligent in taking remedial action").

## II.  Discrimination Claims

Zayadeen may seek to forestall summary judgment on his discrimination claim—the claim that he was terminated on account of his race or national origin—under either the direct

method or the indirect method. *See Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012).

Zayadeen employs the direct method. "Under the 'direct method,' the plaintiff may avoid

summary judgment by presenting sufficient evidence, either direct or circumstantial, that the

employer's discriminatory animus motivated an adverse employment action." *Ibid*. The

appropriate focus under the direct method "is not whether the evidence offered is direct or

circumstantial but rather whether the evidence points directly to a discriminatory reason for the

employer's action." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (internal quotation marks

omitted); *see also Everett v. Cook Cnty.*, 655 F.3d 723, 729 (7th Cir. 2011); *Davis v. Time

Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 672 (7th Cir. 2011).

"Direct evidence is evidence that, if believed by the trier of fact, would prove

discriminatory conduct on the part of the employer without reliance on inference or presumption.

In short, direct evidence essentially requires an admission by the decision-maker that his actions

were based upon the prohibited animus." *Rhodes*, 359 F.3d at 504 (citations and internal

quotation marks omitted); *see also Coleman*, 667 F.3d at 860; *Everett*, 655 F.3d at 729; *Diaz v.

Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). Zayadeen presents no direct

evidence of that nature, which is not surprising given that, in this day and age, employers and

managers rarely admit to having engaged in discrimination.

"A plaintiff can also prevail under the direct method of proof by constructing a

'convincing mosaic' of circumstantial evidence that allows a jury to infer intentional

discrimination by the decisionmaker. That circumstantial evidence, however, must point directly

to a discriminatory reason for the employer's action." *Rhodes*, 359 F.3d at 504 (citations and

internal quotation marks omitted); *see also Brown v. Advocate S. Suburban Hosp.*, 700 F.3d

1101, 1105 (7th Cir. 2012); *Everett*, 655 F.3d at 729 (explaining that circumstantial evidence is "evidence that points to discriminatory animus through a longer chain of inferences"). Circumstantial evidence typically falls into one of three categories: "(1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Diaz*, 653 F.3d at 587; *see also Coleman*, 667 F.3d at 860; *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011).

Zayadeen's most powerful circumstantial evidence is that Semedalas, who decided that Zayadeen would not be given his job back upon returning from his PLOA, was also Zayadeen's primary harasser. A reasonable jury could infer that because Semedalas had previously harassed Zayadeen on account of his race and national origin, Semedalas was motivated by those same discriminatory impulses when deciding whether Zayadeen could return to his job. *See Hasham v. Cal. State Bd. of Equalization*, 200 F.3d 1035, 1044-45 (7th Cir. 2000) (affirming a jury verdict of discrimination where the decisionmaker had stated over a year in the past that he did "not want to hire any more foreigners" and had recently commented on the plaintiff's accent).

Even if this conclusion were subject to doubt, Zayadeen has adduced evidence from which it reasonably could be inferred that Semedalas's stated reasons for the termination were pretextual. Semedalas claims that, upon learning of Zayadeen's desire to take a PLOA, he immediately took steps to fill the position because the finance group was entering a busy period. Yet Semedalas indicated on the PLOA form that there were no business reasons to deny Zayadeen his leave. Doc. 43-5 at 69. Perhaps the explanation for this discrepancy is

innocent—Semedalas approved the leave request as a favor to Zayadeen, even though it put

strain on the finance group. But a jury could just as well arrive at a more sinister

explanation—the PLOA form was correct that there was no immediate business need, and

Semedalas's stated reason for filling the position was pretext to cover up a discriminatory motive

for getting rid of Zayadeen. *See Simple v. Walgreen Co.*, 511 F.3d 668, 671 (7th Cir. 2007) ("A

finding of pretext can … be independent evidence of discrimination."); *Forrester v. Rauland-*

*Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006) ("the case could not be resolved on summary

judgment, because a trier of fact (judge or jury) would be entitled to infer a discriminatory motive

from the pretextual character of the employer's ground [for termination]"). The possibility of

pretext finds further support from evidence that the position was not filled until December 2009,

after the busy cycle had passed. Yet when the position remained vacant in August 2009,

Semedalas passed up the opportunity to fill it by allowing Zayadeen to return to his job. *See*

*Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011) (in reversing the district

court's grant of summary judgment, noting that "an employer who advances a fishy reason [for

terminating an employee] takes the risk that disbelief of the reason will support an inference that

it is a pretext for discrimination"); *Germano v. Int'l Profit Ass'n, Inc.*, 544 F.3d 798, 807 (7th

Cir. 2008) (contemporaneous evidence conflicting with the employer's proffered justification is

evidence of pretext).

AMD paints a different picture of the events, maintaining that Zayadeen was not allowed

to return to his job due to his poor work performance. This submission certainly finds support in

the record. Zayadeen was dangerously close to receiving a poor "Partially Achieved

Expectations" rating in 2008, when at the last minute Johnson decided to give him a good

"Achieved Expectations" rating. Zayadeen's problems continued into 2009, when Heller wrote

Zayadeen the SPE letter listing the areas in which he needed to improve his performance. And

Semedalas claims to have uncovered additional problems with Zayadeen's work in the summer

of 2009. But other evidence in the record suggests that Zayadeen was performing satisfactorily.

Regardless of how close he was to receiving a poor rating in 2008, Zayadeen actually received a

good rating. And in June 2009, immediately before going on leave, two senior directors for

whom Zayadeen provided accounting services told him that he was doing a good job. Semedalas

himself stated that Zayadeen was an employee in "good standing" on the PLOA request. The

record is mixed enough that the court cannot say that a reasonable jury necessarily would find

that Zayadeen was terminated due to his poor work performance and not due to his race or

national origin.

For these reasons, Zayadeen's claims that he was terminated due to race- and national

origin-based discrimination will proceed to trial. As with the hostile work environment claim,

that race-based claim can proceed under Title VII and § 1981, while the national origin claim can

proceed only under Title VII. *See Pourghoraishi*, 449 F.3d at 756.

## III. Retaliation Claims

Zayadeen may forestall summary judgment on his retaliation claim—the claim that

Semedalas did not allow him to return to his job in retaliation for his complaints about

harassment—under either the direct method or the indirect method. *See Milligan*, 686 F.3d at

388. Zayadeen again pursues only the direct method. Doc. 47 at 30-33. Under that method, a

plaintiff "must present evidence of (1) a statutorily protected activity; (2) a materially adverse

action taken by the employer; and (3) a causal connection between the two." *Turner*, 595 F.3d at 687 (internal quotation marks omitted). AMD challenges the first and third elements.

Even assuming that Zayadeen's complaints were protected activity, his retaliation claim fails on causation. To establish causation, Zayadeen must adduce evidence sufficient to allow a reasonable factfinder to conclude that his complaints "were a substantial or motivating factor" in Semedalas's decision to terminate him. *Milligan*, 686 F.3d at 388 (internal quotation marks omitted). The only evidence linking Zayadeen's complaints and his termination is timing—Zayadeen complained about the harassment in 2007 and 2008, and he was terminated in the summer of 2009—and pretext.

The timing is not suspicious at all, as there was a lapse of several months between Zayadeen's complaints about the Borat harassment and his termination. *See Milligan*, 686 F.3d at 390 (a two-month gap is insufficient to establish causation); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (a seven-week interval is insufficient to establish a causal connection). In evaluating whether pretext alone can establish causation for the retaliation claim, it is important to note that Zayadeen's complaints were relatively mild—he simply told Karabatsos and Semedalas, who was then his co-worker, that the Borat references were offensive and unfunny and asked that they stop—and that Zayadeen appears not to have gone over Semedalas's head at the company, let alone file a formal administrative complaint while he was still at the company. Doc. 43-5 at 22; Doc. 49-19 at 5-6. Given this undisputed factual context, it cannot be said that the pretext evidence alone would allow a reasonable jury to conclude that Zayadeen's mild complaints were a substantial or motivating factor in Semedalas's decision to terminate him. Thus, although the record allows Zayadeen to get to the jury on his claim that

Semedalas terminated him due to his race or national origin, it is not strong enough to do so on the claim that Semedalas's animus towards him arose from his complaints about harassment.

## Conclusion

For the foregoing reasons, Defendants' summary judgment motion is granted in part and denied in part. Defendants are entitled to summary judgment on Zayadeen's IHRA harassment claim and his retaliation claim. All other claims survive summary judgment and will proceed to trial.

January 30, 2013

United States District Judge